**IN RE: LEON L. STOLLER, Petition for Reinstatement**

36 So. (2nd) 443 June Term, 1948
July 30, 1948 En Banc

*James M. Carson* and *Joseph Weintraub,* for petitioner.

*S. O. Carson,* Assistant State Attorney, *William A. Lane, Samuel J. Kanner, Hugh Clinkscales* and *E. Max Goldstein,* for Circuit Court Commission, of Dade County.

TERRELL, J:

In May, 1944, charges of unprofessional conduct were preferred against Leon Stoller resulting in his disbarment. The order of disbarment was affirmed by this court in Stoller v. State, 154 Fla. 864, 19 So. (2nd) 312. In May, 1947, pursuant to Section 8, Rule C of the rules of this court, he applied to the Circuit Court of Dade County for reinstatement. His application was heard en banc with the result that two judges recommended that he be not reinstated while one judge recommended that he be reinstated. Transcript of the proceedings was certified to this court for review.

The sole question for our consideration is the one of Stoller's rehabilitation. Any concern that we may have for his disbarment or the reasons for it is remote.

In adjudicating the question of rehabilitation punitive considerations are only incidental and do not control. This principle applies as well when adjudicating charges leading to disbarment, the main object of which is to protect the public and discipline the person disbarred. When Stoller was admitted to the bar his character was tested and approved. Because of unprofessional conduct he forfeited the confidence that was reposed in him and was disbarred and disqualified to practice law. He now seeks restoration on the basis of the good character and reputation he established during the period of disbarment.

Reinstatement is more a matter of grace than of right and is dependent upon rehabilitation and whether or not the disciplinary sanctions have been adequate. Epitomized the record on this point shows that two circuit judges are convinced that he has not rehabilitated himself and should not be reinstated while one circuit judge is convinced that he has rehabilitated himself and should be reinstated. The Grievance Committee of Dade County Bar Association recommends that he be not reinstated and urged its objections by briefs. The Board of Directors of the Miami Beach Bar Association join in the recommendation that he be reinstated. The Circuit Court Commission of Dade County filed a report wherein it stood neutral and declined to approve or disapprove reinstatement. Rabbi Irving Lehrman of the Miami Beach Jewish Community

Center wrote a strong letter endorsing Mr. Stoller's reinstatement and more than sixty of the leading business and professional men of Miami who knew him personally recommended his reinstatement.

Added to this it is shown that Stoller since his disbarment, has engaged in the real estate business; that he enjoys the confidence of those with whom he has dealt, that his conduct has been good, that he has established a good credit as a business man, that his standing in the community is good, that many leading business men and lawyers in his home community (Miami Beach) think he has rehabilitated himself and recommend his reinstatement.

To rehabilitate means to restore to one's former rank, privilege or status, to clear the character or reputation of stain, to retrieve forfeited trust and confidence. Forgiveness and pardon are as much a part of our scheme of things as prosecution and punishment but the approach to it should be through democratic processes. It, therefore, follows that an application for reinstatement to practice law may be peremptorially denied; it may be granted with reservations as In Re: Lambdin, 158 Fla. 749, 30 So. (2nd) 191, or it may be granted unconditionally as In Re: Hurtenbach, 157 Fla. 871, 27 So. (2nd) 348. In Re: Lathero, 157 Fla. 630, 26 So. (2nd) 677; like disbarment, it may be complete or partial.

Measured by the foregoing test, has petitioner rehabilitated himself? The answer must be found in his conduct during disbarment, the reasons for which, if important at all, are only incidental at this time. Does he show penance for the acts for which he was disbarred? Does he realize that the practice of law is a highly respectable profession, the main business of which is administrating justice, or does he think of it as a trade for the practice of tricks or an avenue to short circuit those who seek his counsel? Have adequate sanctions been exacted? Is he in accord with the thesis that character is more important than money and that the administration of justice should reflect democratic ideals rather than smack of totalitarianism? If his conduct since disbarment reveals an attitude pointing to these concepts and the best traditions of the profession, he should be given another chance.

In so far as directed to the point of rehabilitation the evidence may be amenable to the charge of being unorthodox but this is not an orthodox legal trial. It is a character test. The evidence was a sample from a considerable sector of the bar and the public, but the courts and the bar are trustees of the public to administer justice so there can be no criticism of the procedure. The evidence points both ways but the weight of it shows that Stoller has acted in a way to warrant public confidence, that he enjoys the trust of those with whom he has dealt and that he has a new approach to his responsibility as a lawyer. An examination of Stoller's testimony shows that he has an earnest desire to remove the stigma of disbarment from his name. The best test of rehabilitation is confession of sin and a resolve to make restitution for it.

Unanimous approval of petitioner's application would hardly be expected. Totalitarian trial philosophy being comprehended in the unrestrained command of the dictator, no jury or court to review it, may enjoy the blessing of unanimity but the source from which our trial philosophy derives is the Bill of Rights and that proceeds from reason and due process. The Bill of Rights was provided as a barrier to protect the individual against the arbitrary exactions of majorities, executives, legislatures, courts, sheriffs and prosecutors and it is the primary distinction between democratic and totalitarian processes. Any departure from the safeguards in the Bill of Rights is apt to be an appropriation of some phase of the totalitarian way.

The responsibility to make this country sensitive to the Bill of Rights is one that rests largely on the bench and bar. When the Great Assize sets its seal of approval on individual conduct it will not be predicated on a count of noses but on the way we look inside. When Abraham importuned God to save Sodom, his prayer was granted on condition that ten righteous be found there. Petitioner makes a much better showing for restitution than that. His Rabbi, joined by many other good and true men in Miami, thinks he has earned the right to another chance. We are in agreement with them but aside from the showing he makes and the protection accorded him by the Bill of Rights it might be a base example of spiritual

ingratitude for a gentile court to shut the door in the face of a child of Abraham, seeking forgiveness, when the "Record" discloses that his ancestors went from the synagogue as missionaries to our ancestors and taught them the law of forgiveness including the spiritual concept on which the Bill of Rights, the worth of the individual and everything worth while in our democratic theory rests. This is the law that he now invokes in his behalf.

We think that on the showing of rehabilitation so made the petition requires an affirmance answer. It is, therefore, granted with directions to the circuit court to enter an order of reinstatement conditioned as it may deem advisable to aid petitioner in his effort to broaden the scope of his good name and character.

It is so ordered.

ADAMS, BARNS and HOBSON, JJ., concur.

THOMAS, C. J., and CHAPMAN, J. dissent.

SEBRING, J., not participating.

THOMAS, C. J., dissenting:

I disagree because I am not convinced that the circuit judges acted erroneously.